

**SO ORDERED.**

**SIGNED this 1 day of August, 2014.**

_____

**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                            CASE NO. 13-00159-8-DMW

MICHAEL JOHN SKUBIC,
                                                                 CHAPTER 7
    Debtor.

RICHARD D. SPARKMAN,
Chapter 7 Trustee, and

KELLY TRACTOR CO.,

    Plaintiffs,                                   ADVERSARY PROCEEDING
                                                                 NO. 13-00109-8-DMW
v.

MICHAEL JOHN SKUBIC,

    Defendant.

                                                                 and

IN RE:                                                           CASE NO. 12-08648-8-DMW

STACY LYNN SKUBIC,
                                                                 CHAPTER 7
    Debtor.

**KELLY TRACTOR CO.,**

    **Plaintiff,**

**v.**

**STACY LYNN SKUBIC,**

    **Defendant.**

**ADVERSARY PROCEEDING
NO. 13-00110-8-DMW**

### ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

This matter comes on to be heard upon the Plaintiffs' Motion for Summary Judgment ("Motion") filed by Kelly Tractor Co. ("Kelly Tractor") and Richard D. Sparkman, Esq., ("Trustee"), Chapter 7 trustee for Michael John Skubic, and the responses thereto filed by Defendants Michael John Skubic ("Mr. Skubic") and Stacy Lynn Skubic ("Ms. Skubic"). The court conducted a hearing in Raleigh, North Carolina on May 28, 2014. Leslie Lane Mize, Esq. appeared for the Trustee and Kelly Tractor ("Plaintiffs"). Cort I. Walker, Esq. appeared on behalf of Mr. Skubic, and William E. Brewer, Jr., Esq. appeared for Ms. Skubic. Based upon the evidence presented and the arguments of counsel, the court makes the following findings of fact and conclusions of law:

A.    BACKGROUND

1.    Mr. and Ms. Skubic (collectively "Defendants") are a married couple who reside at 9409 Clover Crest Court, Raleigh, North Carolina ("Property"). The Property is apparently vested in the estate of Mr. Skubic's mother, Gladys E. Skubic, who passed away in 2010. Gladys Skubic's estate has not yet been probated, and Mr. and Ms. Skubic do not own any real property.

2.     Mr. Skubic has been in the business of asphalt crushing for approximately 20 years and has been involved with numerous businesses ("Related Entities"), including Interstate Custom Crushing, LLC; Interstate Crushing, Inc.; Interstate Materials, LLC; Coastal Crushing, LLC ("Coastal Crushing"); GreenCycle Materials, LLC ("GreenCycle"); and Premier Custom Crushing, LLC.  All of the Related Entities, with the exception of Premier Custom Crushing, LLC, have been administratively dissolved by the North Carolina Secretary of State.

3.     Although Mr. Skubic has overseen the majority of the operations for all of the Related Entities, Gladys Skubic was the sole member of Interstate Custom Crushing, LLC, and Ms. Skubic was the sole member of Coastal Crushing and GreenCycle.

4.     Mr. and Ms. Skubic are liable for numerous judgments entered against them in civil suits initiated by vendors and equipment dealers of the Related Entities.  Because Mr. and Ms. Skubic do not own any real property, their judgment creditors are limited to executing on Mr. and Ms. Skubic's personal property.

5.     GreenCycle was formed February 19, 2010.  According to Ms. Skubic, she is the sole member manager, at least in part, because Mr. Skubic would not have been able to obtain equipment acquisition financing at the time of GreenCycle's formation.   GreenCycle was originally formed as a shingle grinding and recycling business, but eventually GreenCycle began performing substantially similar work as the other Related Entities had in the past.

6.     From its formation until sometime in early 2013, GreenCycle maintained two bank accounts.  One GreenCycle account was maintained at SunTrust Bank ("SunTrust"), and the other bank account was maintained at Wells Fargo Bank, NA ("Wells Fargo").  The parties appear to use the designation of "GreenCycle Account" to both the SunTrust account and the Wells Fargo account; therefore, the court will be consistent and use that reference.  Mr. and Ms.

Skubic each had access to two check cards connected to the GreenCycle Account. The GreenCycle Account was used by Mr. and Ms. Skubic to pay both business and personal expenses.

7.  Ms. Skubic maintained at least two personal accounts with Wells Fargo during the time period that GreenCycle was active. One of those accounts ending in 6280 has been designated by the parties as a "Household Account" and was the one used more frequently by Mr. and Ms. Skubic. The other Wells Fargo account ending in 7063, also in Ms. Skubic's name, was used less frequently. Ms. Skubic also maintained a personal account with SunTrust. Ms. Skubic's personal accounts were used to pay both business and personal expenses.

8.  GreenCycle used Quickbooks for its accounting software. One of the accounts used in the Quickbooks program is named "Shareholder Account." To the extent that cash transfers were made from the GreenCycle Account to the Household Account or payments were made by GreenCycle for Mr. or Ms. Skubic's benefit, the Quickbooks Shareholder Account would be adjusted to indicate that Mr. or Ms. Skubic received a distribution from GreenCycle. Similarly, if a cash transfer were made from the Household Account to GreenCycle, the Quickbooks Shareholder Account would reflect those funds going into GreenCycle.

9.  Mr. Skubic opened a personal bank account in late 2012 or early 2013. Prior to opening that account Mr. Skubic had not had a personal bank account since before 2010.

10.  On or about December 23, 2010, Ms. Skubic signed an Application for Credit with Kelly Tractor as "President-Owner" of GreenCycle. According to Ms. Skubic, the Application was completed by Mr. Skubic, but she signed the signature line as well as a personal guarantee included in the Application[1].

---

[1] According to the record from the 2004 Examination of Ms. Skubic, when presented with the Application for Credit and upon examination of the signature lines, Ms. Skubic stated "I believe that's my signature. . . . Yeah I

11.     On February 3, 2011, a lease agreement ("Lease Agreement") between GreenCycle and Kelly Tractor was executed, purportedly by Ms. Skubic.  In fact, Mr. Skubic signed Ms. Skubic's name to the Lease Agreement.  Ms. Skubic does not believe she authorized Mr. Skubic to sign the Lease Agreement or any other equipment rental agreements on her behalf. Under the terms of the Lease Agreement, Kelly Tractor leased to GreenCycle, for $16,000.00 per month, a Pioneer Track Mounted Impactor.  This equipment item was insured for the sum of $539,300.00.

12.     In August of 2011[2], in an effort to obtain additional capital to pay creditors of Coastal Crushing and GreenCycle, Mr. and Ms. Skubic entered into negotiations with John Dillinger, President of Keystone Transport Company, Inc.  According to Mr. Skubic, Mr. Dillinger was going to supply capital to pay the creditors of Coastal Crushing and GreenCycle, including Kelly Tractor, in exchange for a membership interest in the two companies.  In December of 2011, Mr. Dillinger informed Mr. Skubic that he was no longer interested in the contemplated arrangement.

13.     On January 13, 2012, Mr. Skubic offered a diamond necklace, formerly belonging to his mother, as collateral for a $15,000.00 cash advance paid by National Pawn #7 in Raleigh, North Carolina.  On August 29, 2012, Mr. Skubic offered one necklace, one ring, two bracelets and three pairs of earrings as collateral for a $3,075.00 cash advance paid by National Pawn #7. Mr. Skubic offered three rings and three watches as collateral for a $9,338.20 cash advance paid by National Pawn #7 on April 23, 2013.

---

think they are mine."  The court finds that Ms. Skubic signed the Application for Credit and the personal guaranty included therein.

[2] In Mr. Skubic's 2004 Examination, he at one point stated that the negotiations with Mr. Dillinger took place in 2010; however, in discussing the events surrounding the negotiations with Mr. Dillinger, Mr. Skubic referenced GreenCycle's debt to Kelly Tractor as well as two companies that were formed shortly after the negotiations with Mr. Dillinger fell through.  Based upon the fact that the Lease Agreement was not executed until February 3, 2011, and that the companies referenced by Mr. Skubic were actually formed in late 2011 and early 2012, it appears that the negotiations with Mr. Dillinger took place between August and December of 2011, not 2010.

14.     GreenCycle defaulted on its Lease Agreement with Kelly Tractor, and from January until August of 2012, Mr. Skubic communicated with Kelly Tractor regarding GreenCycle's delinquency.  In an email dated August 1, 2012, representatives of Kelly Tractor informed Mr. Skubic that Kelly Tractor would be repossessing its equipment.  That repossession occurred in September, 2012.  Based on the bank statements provided to the court, it appears the last payment from GreenCycle to Kelly Tractor was made June 11, 2012 in the amount of $5,000.00.

15.     From May 15, 2012 through July 2, 2012, the sum of $4,000.00 was paid from the GreenCycle Account to Ms. Skubic's father, Lorne Turner.  Mr. and Ms. Skubic's Statements of Financial Affairs indicate that Mr. Turner loaned $40,000.00 to Interstate Materials, LLC in June, 2009 for the purchase of an L-150C Volvo Loader.  According to Ms. Skubic, GreenCycle remitted funds to Mr. Turner because GreenCycle had been using the L-150C Volvo Loader and because Mr. Turner had informed Ms. Skubic that he needed money.  Ms. Skubic also paid a total of $5,175.00 to Mr. Turner out of her personal Wells Fargo account between August 8, 2012 and November 28, 2012.

16.     On June 14, 2012, the Wake County Revenue Department seized the sum of $897.49[3] from one of Ms. Skubic's personal bank accounts to collect unpaid vehicle taxes.

17.     Throughout 2012, funds were frequently transferred from the GreenCycle Account into the Household Account.  Often, in the days following a transfer from the GreenCycle Account into the Household Account, funds would be returned to the GreenCycle Account, although the amount of funds transferred out of the GreenCycle Account far exceeds the amount of funds returned to the GreenCycle Account.  According to Mr. Skubic, funds were

---

[3] This is the amount that was acknowledged by Ms. Skubic during her 2004 Examination during the authentication of her personal bank statements.  In the affidavit filed May 23, 2014 in response to Plaintiffs' Motion, Ms. Skubic states that $936.06, the full amount listed in the Notice of Attachment, was seized.

6

moved between the GreenCycle Account and the Household Account because Mr. and Ms. Skubic "had to protect [their] accounts from creditors."  Ms. Skubic stated that funds were moved in order to protect funds in the GreenCycle Account from "vendors that had the [GreenCycle] credit card number."  The Plaintiffs calculate that in 2012, the sum of $350,445.00 was transferred from the GreenCycle Account into the Household Account, while only $219,000.00 was transferred from the Household Account into the GreenCycle Account.  The Plaintiffs also calculate that in 2012 Mr. or Ms. Skubic took $100,279.00 from the GreenCycle Account in the form of ATM or branch withdrawals and wrote $21,800.00 in checks made out either to Mr. or Ms. Skubic or to cash.

18.     On December 7, 2012, Ms. Skubic filed a petition for relief under Chapter 7 of the United States Bankruptcy Code, Case Number 12-08648-8-DMW.  Holmes P. Harden, Esq. was appointed as Chapter 7 trustee.

19.     Mr. Skubic filed a petition for relief under Chapter 7 of the United States Bankruptcy Code on January 9, 2013, Case Number 13-00159-8-DMW.  Mr. Sparkman was appointed as Chapter 7 trustee in Mr. Skubic's case.

20.     On March 6, 2013, upon Motions filed by Kelly Tractor in Mr. and Ms. Skubic's bankruptcy cases, the court entered Orders requiring Mr. and Ms. Skubic to appear to be examined under oath ("2004 Examination") by counsel for Kelly Tractor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.  The Orders also required that Mr. and Ms. Skubic produce certain documents to Kelly Tractor prior to the 2004 Examination, including bank account statements of GreenCycle and statements for any credit cards issued to or used by Mr. or Ms. Skubic.

21.    On July 3, 2013, the Plaintiffs filed a Complaint against Mr. Skubic designated as Adv. Pro. No. 13-00109-8-DMW and a Complaint against Ms. Skubic designated as Adv. Pro. No. 13-00110-8-DMW.  In an Order dated October 22, 2013, the two adversary proceedings were consolidated.  The action against Mr. Skubic, Adv. Pro. No. 13-00109-8-DMW, was designated as the lead case under which all pleadings would be filed.  Although the two adversary proceedings have been consolidated, the causes of action against the two Defendants are not identical, and Mr. and Ms. Skubic have obtained separate counsel due to the potential conflict of interest an attorney may have representing both Defendants[4].

22.    On September 19, 2013, Ms. Skubic filed an Answer to the Complaint filed against her.  On September 23, 2014, Mr. Skubic filed a verified Answer to the Complaint filed against him.

23.    The Complaints include causes of action brought under multiple sections of the United States Bankruptcy Code.  This court determined in an Order dated November 19, 2013 that "there are reasons to consider the § 727 claims prior to determination of the other claims, including that a ruling in favor of the Plaintiffs on the § 727 claims may eliminate the need to consider the other claims."

24.    The Plaintiffs filed the Motion for Summary Judgment on April 1, 2014.

25.    Mr. Skubic filed a Response to the Motion on April 28, 2014, along with a Declaration by Mr. Skubic and a Memorandum of Law in opposition to the Motion.  Ms. Skubic filed also filed a Response on April 28, 2014.

---

[4] Although Mr. Brewer withdrew as counsel for Mr. Skubic in his adversary proceeding, he has not filed a motion to withdraw as counsel in Mr. Skubic's associated Chapter 7 case.  Nonetheless, it appears from the record that Mr. Walker is appearing as counsel in Mr. Skubic's bankruptcy case.

26.     On May 23, 2014, Ms. Skubic filed an Affidavit ("Affidavit") that purported to clarify Ms. Skubic's understanding of the transactions that were discussed at length during her 2004 Examination.

27.     The claims that are the subject of the Motion are the Plaintiffs' claims brought pursuant to 11 U.S.C. § 727, specifically:

    a.     That neither Mr. nor Ms. Skubic is entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2)(A);

    b.     That neither Mr. nor Ms. Skubic is entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2)(B); and

    c.     That Mr. Skubic is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(7).

B.     JURISDICTION

This matter, as an objection to the discharge of both Defendants, is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J), and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.  The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

C.     DISCUSSION

1.     Rule 56(a) of the Federal Rules of Civil Procedure, made applicable to bankruptcy procedures by Rule 7056 of the Federal Rules of Bankruptcy Procedure, states that a court "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

2.      "The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

3.      In ruling on a motion for summary judgment, the court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" filed by the parties. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

4.      To determine whether summary judgment is warranted, the court "must consider whether a reasonable jury could find favor in the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

5.      In order to challenge successfully a debtor's discharge under §§ 727(a)(2)(A) and (B), a plaintiff must prove that

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed [either] property of the debtor, within one year before the date of the filing of the petition; or property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

6.      In the Motion, the Plaintiffs assert that the Defendants' actions were so clearly taken with the intent to hinder, delay, or defraud creditors that no reasonable jury could find otherwise, and summary judgment is therefore appropriate.

7.      A key element of § 727(a)(2), on which the court's decision on the Motion is hinged, is that of intent.  Generally, summary judgment is "inappropriate 'when issues such as motive, intent**,** and other subjective feelings and reactions are material, when the evidence presented is subject to conflicting interpretations, or where reasonable [persons] might differ as

to the significance of any particular piece of evidence.'" *Blue Ridge Pub. Safety, Inc. v. Ashe*, 712 F. Supp. 2d 440, 447 (W.D.N.C. 2010) (quoting *Gregorino v. Charlotte-Mecklenburg Hosp. Authority*, 121 N.C. App. 593, 595, 468 S.E.2d 432, 433 (1996)).

8.     Despite courts' reluctance to grant summary judgment in cases involving intent, summary judgment on a cause of action brought under 11 U.S.C. § 727(a)(2) is certainly not atypical (*see, e.g. Hernando v. Beverly Mgmt., LLC (In re Hernando)*, 2013 U.S. Dist. LEXIS 140797 (W.D.N.C. Sept. 30, 2013).  In those such cases, the actions of the debtor so clearly indicate the intent to hinder, delay or defraud that the court determines no reasonable jury could find an alternate intent behind the acts taken.

9.     Nonetheless, "[i]n the context of § 727(a)(2), proof of intent is difficult, as it is in other contexts, and usually requires a resort to circumstantial evidence." *First Leasing Co. v. McGalliard (In re McGalliard)*, 183 B.R. 726, 732 (Bankr. M.D.N.C. 1995) (citing *First of Am. Bank v. Afonica (In re Afonica)*, 174 B.R. 242, 246 (Bankr. N.D.Oh. 1994)).

10.     As stated by this court in the context of a fraudulent conveyance action brought pursuant to 11 U.S.C. § 548(a)(1)(A), "[t]he presence of fraudulent intent requires an evaluation of the circumstances surrounding the transaction at issue, taking into account 'factors that militate against a finding of fraudulent intent as well as considering those that suggest fraud.'" *Angell v. Meherrin Agric. & Chem. Co. (In re Tanglewood Farms, Inc.)*, 2013 Bankr. LEXIS 1443, at *30 (Bankr. E.D.N.C. Apr. 8, 2013) (quoting *Ward v. Jenkins (In re Jenkins)*, 2012 Bankr. LEXIS 5722, at *16 (Bankr. W.D.N.C. Dec. 12, 2012)).

11.     In order to facilitate the analysis of a debtor's actions to determine whether the requisite intent is present, courts have developed certain "badges of fraud" which are indicative

that a debtor has acted with the prohibited intent.  Courts have identified the following badges of fraud which are applicable to the cases at hand:

> family, friendship or insider relationships between the parties; the debtor's retention of possession, benefit or use of the property in question; . . . the existence . . . of [a] pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; the general chronology of the events and transactions under inquiry; the debtor's attempt to keep the transfer a secret; and the proximity of the transfer to the debtor's filing bankruptcy.

*West v. Abdelaziz (In re Abdelaziz)*, 2012 Bankr. LEXIS 591, at *7-8 (Bankr. M.D.N.C. Feb. 1, 2012).

12.     In the Defendants' cases, badges of fraud are certainly present, including, but not limited to, the following:

a.     Accounts were kept in the name of either GreenCycle or Ms. Skubic only, making it impossible for Mr. Skubic's creditors to attempt to collect on their judgments;

b.     Frequent movement between the GreenCycle Account and the Household Account prevented large sums of money from accumulating in one account, and creditors of GreenCycle who were not also creditors of Ms. Skubic could not take action to collect payment from the Household Account;

c.     As GreenCycle became increasingly delinquent on its obligations, including payments under its Lease Agreement to Kelly Tractor, GreenCycle paid $4,000.00 to Ms. Skubic's father.  Further, Ms. Skubic subsequently paid him $5,175.00 at a time when her only source of "income" was through distributions from the GreenCycle Account;

d.     Although it is unclear from Mr. Skubic's 2004 Examination testimony whether he has any influence over the probate of his mother's estate, the delay in the

closing of Gladys Skubic's estate precludes the vesting of any real property in Mr. Skubic's name, even though he and Ms. Skubic reside in the Property.

13.     Despite the presence of badges of fraud in the Defendants' cases, the court must nevertheless examine any "mitigating" factors, or actions taken by Mr. or Ms. Skubic which may indicate that they were not acting with the intent to hinder, delay or defraud creditors.  The court must scrutinize all of the evidence, taken in the light most favorable to the Defendants, to determine whether a reasonable jury could find that, despite the presence of the badges of fraud, Mr. and Ms. Skubic acted without the requisite intent under § 727(a)(2).

14.     Mr. and Ms. Skubic provided explanations to certain actions, asserting that there were reasons behind the decisions they made that are inconsistent with the intent alleged by Plaintiffs.  These "badges of a desperate but well-intentioned debtor" including the following:

        a.      Both Mr. and Ms. Skubic assert that GreenCycle was established with Ms. Skubic as the sole member manager because at the time, Mr. Skubic's credit would not have been strong enough to obtain purchase money financing from equipment dealers. While Mr. Skubic's strategy seems a bit underhanded, it provides a counter to the suggestion that GreenCycle was created in Ms. Skubic's name to hinder, delay or defraud Mr. Skubic's creditors;

        b.      During the months in which GreenCycle began having trouble consistently paying its creditors, Mr. Skubic entered into negotiations with Mr. Dillinger in an attempt to consolidate GreenCycle's debt and pay GreenCycle's creditors.  Although these negotiations eventually deteriorated, the record of Mr. Skubic's interactions with Mr. Dillinger could be seen as evidence of Mr. Skubic's intention to pay creditors;

c.     After Mr. Skubic received the $15,000.00 advance from National Pawn #7 on January 13, 2012, between January 17 and January 31, 2012, a total of $15,500.00 was either deposited or transferred from the Household Account into the GreenCycle Account. Of the $15,500.00, the sum of $3,000.00 was designated as a "loan to company" by Ms. Skubic.  Over that same period from January 17 to January 31, 2012, the following payments were made out of the GreenCycle Account:

| Amount | Purpose |
|---:|---|
| $9,541.91 | Payroll and employee wages |
| $142.31 | Payroll taxes and fees |
| $66.70 | Food |
| $290.14 | Employee fuel reimbursements |
| $1,023.88 | Parts and supplies for the GreenCycle plant |
| $6,609.50 | Fuel for the GreenCycle plant |
| $4,000.00 | Payment to Carolina Heavy Machinery for equipment rental |
| $50.00 | Transfer to Coastal Crushing |
| $200.00 | Transfer to Ms. Skubic's "shareholder account" |
| $190.66 | "Charitable contribution" to Ravenscroft School |
| $512.25 | Travel and lodging |
| $66.44 | Courier costs (FedEx) |
| $912.12 | Monthly payment for Mr. Skubic's truck |
| $311.07 | Life Insurance |

It should be noted that following the August 29, 2012 advance of $3,075.00 from National Pawn #7 to Mr. Skubic, there does not appear to be any corresponding deposit of the proceeds into the GreenCycle Account.  Ms. Skubic's and GreenCycle's bank records for 2013 have not been included in the record, so the court has no way to determine whether the April 23, 2013 advance of $9,338.20 from National Pawn #7 to Mr. Skubic was deposited into an account used to pay Mr. and Ms. Skubic's creditors. Nevertheless, the GreenCycle Account activity in the weeks following Mr. Skubic's first advance from the pawn shop constitutes evidence which a reasonable jury could construe to defeat allegations of fraudulent intent; and

14

d.      The GreenCycle Account bank statement shows that, although Mr. and Ms. Skubic clearly made poor decisions on how to best cut costs during the latter part of 2012 (*e.g.*, by continuing to maintain season tickets for performing arts and satellite television service at the office), payments were still being made to creditors.  Although the last payment made to Kelly Tractor appears to have occurred on June 11, 2012, GreenCycle continued to pay other creditors through the end of 2012.  A debtor may not make payments in preference of one creditor "with a specific intent to impermissibly hinder and delay another creditor," but "the mere intent to prefer one creditor over another cannot be equated with the intent to hinder, delay or defraud required under § 727(a)(2). *McGalliard*, 183 B.R. at 732.

15.     The court acknowledges that the transaction registers of the various bank accounts to which Mr. and Ms. Skubic had access show extremely suspicious movement of funds.  These transfers are abnormal and are a cause of great concern; however, the court must take inferences in the light most favorable to the Defendants, and their alternative explanations must thus be given weight.

16.     In addition, after a tedious review of the transcripts of both Mr. and Ms. Skubic's 2004 Examinations, it is clear to the court that the Defendants are less than sophisticated in money matters.  Even with tools such as Quickbooks, the Defendants' record-keeping is abhorrent, and their understanding of the avenues by which creditors may achieve repayment on debts oftentimes seems incomplete or misinformed.  Mr. Skubic knows surprisingly little of the details regarding the multiple judgments against him and the Related Entities, and Ms. Skubic could not seem to recall any details about who authorized the repeated movement of funds between the GreenCycle Account and the Household Account.  That lack of information or

15

recollection may or may not be manufactured. The court believes that the opportunity to hear the Defendants' testimony in person and under oath may allow for clarity to discern fraud from ignorance.

17. Finally, it is important for the court to remain ever cognizant of the fact that while the adversary proceedings against both Defendants have been consolidated, there are still two separate debtors involved. It is thus conceivable that one Defendant could be found worthy of a discharge, while the other would not. While the pleadings and their attachments are very helpful in providing the court with an idea of what actions Mr. and Ms. Skubic took and for what reasons, the court believes that testimony in a trial setting will allow for an even clearer picture as to where culpability, if any, should be assigned with respect to each incident alleged to satisfy the elements of § 727(a)(2).

18. As noted above, Ms. Skubic filed an Affidavit on May 23, 2014. Plaintiffs objected to the court's consideration of the Affidavit at the hearing, asserting that because it was filed 52 days after the Motion it was not timely filed pursuant to E.D.N.C. LBR 7007-1 (requiring that a response be filed "within 21 days after service of the motion"). The affidavit purports to clarify a portion of Ms. Skubic's testimony at her 2004 Examination which seemed to suggest that the Defendants were, in fact, acting out of fear of collection efforts, and that they did intend to hinder creditors when they transferred funds between the GreenCycle Account and the Household Account. The court finds that the Affidavit was not timely filed, and the court has not considered the Affidavit in ruling on the Motion; however, the seemingly contradictory nature of Ms. Skubic's testimony at the 2004 Examination and the declaration within her affidavit certainly indicate that the opportunity to hear both Defendants' testimony at trial will be valuable to the court in its effort to determine the culpability of each Defendant. Further, any

prior inconsistent statement is excellent fodder for testimonial impeachment.The Plaintiffs also moved for summary judgment under 11 U.S.C. § 727(a)(7).  The reasoning behind the denial of the relief under § 727(a)(2) applies to that issue as well, so the Motion will also be denied for summary judgment under § 727(a)(7).

19.     As previously stated by the court in its November 19, 2013 Order, the § 727(a) claims should be determined first, so to the extent that the Motion requests summary judgment on the claim under § 523, the Motion for summary judgment under § 523 is denied; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1.     The Plaintiffs' Motion for Summary Judgment is denied; and

2.     A trial will be scheduled on the merits of Plaintiffs' claims brought pursuant to 11 U.S.C. § 727.

**END OF DOCUMENT**